Case number 15-1183 et al. Consolidated Edison Company of New York Inc. Petitioner versus Federal Energy Regulatory Commission. Mr. Bress for the petitioners, Ms. Rylander for the respondents, Mr. Gossett for the respondent interveners. Good morning, Mr. Bress. Good morning, Judge Cassis, and may it please the court. The Federal Power Act tasks FERC with ensuring that rates are just and reasonable. Among other things, this means it's FERC's job to ensure that cost allocations, when challenged, are at least roughly commensurate with the benefits received. Petitioners are here this morning because FERC failed to do its job in this case. Petitioners demonstrated with undisputed evidence in the proceedings below that the cost allocations here were vastly disproportionate, even to the inflated benefits that PJM credited them with. For example, they demonstrated that Linden ultimately was allocated 100% of the cost of the Seaworm project, even though it was credited with only 28% of the benefits. They demonstrated that... Counsel, I saw that in your brief. Do you have a principled line which would illustrate where FERC violated the law and where they didn't? What percentage would be the principled line? Your Honor, I don't know that it comes down to a particular percentage, but certainly these cost allocations are even more disproportionate, Your Honor, than the cost allocations that this court struck as grossly disproportionate in the Old Dominion case. So even if you just wanted to compare it to what this court has previously done, these cost allocations would be disproportionate. But there are actually, there are administrative law bases, Your Honor, that rise above this that I think this court can look to in deciding that FERC got this wrong. And I think there are three of them that I would focus on today. One is just a failure to examine relevant considerations because FERC refused over and over to even look at the evidence of the cost allocations that were issued here, even though it was undisputed evidence. Second, FERC failed to treat like cases alike because it departed without any reason justification from its determination in the Artificial Island case that the flow-based method can't reasonably be used to allocate costs for the application of the 1% de minimis exclusion, even though that exempted larger zones from paying their fair share shifted those costs on the petitioners and led to, directly to, the grossly disproportionate allocations that are issued in this case. I'd be happy to go through those, Your Honor, unless you'd like me to return to your question because I don't think there is, we're not asking for exacting precision. This court has made quite clear that that's not necessary. On the other hand, when you've got allocations that are, that are, A, incredibly disproportionate and, B, unnecessary, unnecessarily so, that's something that FERC can't say okay to. Another way to think about this is, as the Seventh Circuit put it, if crude is the best that can be done, then crude will have to be good enough. Here, in this case, we've demonstrated that the methodologies that were used were inappropriate for these projects and that the 1% de minimis that was thrown on top of the flow-based method and used with it is utterly unnecessary and just introduces discrimination. Yes, if I could ask you a question about that. You say in your brief that the de minimis exception is an administrative override and here you just said it's laid on top of the flow-based method, but my understanding is that it's part of the flow-based method, that it's sort of baked into the tariff. So, I'm, if you could just clarify what you mean when you say it's laid on top of the tariff. Certainly, Your Honor. First of all, the de minimis exclusion preceded and prior to PKM's movement to the flow-based methodology. It was when it was still using the violation-based method previously. Secondly, it adds nothing of value to the application of the flow-based method. In other words, the flow-based method works by effectively determining how much each zone uses the new facility or the improved facility as compared to how much other zones use it. I'm simplifying a bit, but that's basically what it does. And then it allocates each proportionate cost based on that, based on their relative use. When you throw in the 1% de minimis value, it exempts certain zones from any cost allocation whatsoever. Even if those zones use the new facility far more than the other zones who end up having to pay for it. It's not an integral part in any sense of using flow-based. It actually is contrary to and undermines what the flow-based methodology is trying to do in the first place, which is to allocate based on relative flows. You use this method and suddenly someone who uses it 10 times as much doesn't have to pay anything. And someone that uses it 10 times as little ends up having to carry the other one's load. It is part of the tariff, so it's applied in allocation. It's not as though FERC or PJM could choose when to apply it. Your Honor, we absolutely agree that it's part of the tariff. And I'm sorry if we caused any confusion in that front. Our point is simply that it's not an inherent and necessary part of the flow-based method. If I could start from the top, perhaps. Counselor, excuse me. There are a couple of technical questions I have. Is it correct to say, as you've said, that Artificial Island, the South Jersey case, excludes all non-flow-based interferences? Isn't that an unfair statement? Your Honor, that case involves stability-based non-flow violations. No, no. And all that the case has, all that the case determines. Don't you just answer my question. Isn't it an overstatement to say that it established the principle that interferences, other than flow-based, were treated differently? No. All interferences, whether it's a stability question or a short-circuit question, that's not fair, is it? I think it is fair, Your Honor. Even though that case involved a stability-based violation, the essential reading, what a court would consider the holding of the case, was that the flow-based method works and works well and fine in circumstances where what you're trying to achieve is relief of a flow constriction, whether that's voltage-based or thermal-based. Didn't FERC limit their decision to stability? What it said in that case, Your Honor, is that stability is a unique circumstance, but you can't limit the essential reasoning. A court can't do it and FERC can't do it, simply by calling something unique. In other words, in the next case that comes up, you can't throw away the essential reading or holding because you want to come to different results. If this court looks to what FERC said in Artificial Island, as this court understood it in the appeal from that case, the entire reasoning that FERC employed in that case was that the flow-based method reasonably establishes the beneficiaries when what you're trying to accomplish for the project is more flow. In other words, if we're putting more flow in line, those that use that more flow are the beneficiaries. On the other hand, what the court said is that even though Artificial Island involved construction of a new transmission line, use of that transmission line was not itself a benefit because there was no need for additional flow. In other words, the system was already sufficient as it was flow-wise. Your argument is that the logic of Artificial Island supports you, but you overstated when you stated that it was a holding that any non-flow interference was treated separately. I accept that. What I would say is that the logic compels the same results. I understand your argument. The second question I have, which really mystifies me, is the netting issue. I don't understand it. I think I understand your argument, but I don't understand the whole question. If we're dealing with flow going both ways, then only one way would go over the new facility. I don't understand why flows both ways count. I don't get it. Your Honor, I can't explain this, fortunately. The answer is I can. I can and will. I'm doing so now. The way that it's been presented by FERC is as though you've got a river that always goes in one direction, even though there are flows that might be trying to go the other way. It always goes in one direction over a dam, let's say. Oh, I see. I see. FERC's position is if there is flow going the other direction, it reduces the amount of pressure going in the direction over. I finally saw it. I see. That's FERC's position, Your Honor, but in fact, these projects involve, first of all, multiple lines, so there are lines going both directions. Some of them are akin to two-way allows flows in both directions. Some of them are more like Canal Road, Your Honor, where at certain times they're in one direction and at certain times they're in the other, depending on how much flow there is in one direction or the other. This method recognizes that. As we've explained in our brief, this method recognizes that there are flows in both the positive and negative direction and assigns costs to the zones that have flow in one direction or the other. They just pretend with netting that they completely offset one another. Wait a minute. Now I understand. Logically, that's correct because if you're measuring the flow over a new facility to the right and the transmission or whoever sends a certain amount of flow to the left, that reduces the amount that would go to the right, so therefore, that would be a correct analysis and netting makes sense then. So netting would make sense, Your Honor, under a violation-based method, which is where it came from. In other words, if you're trying to... No, no, no, no, no, no, no. I'm thinking of it not as a violation-based, but rather the amount of flow that's used over the new facility. If you go backwards the other way, you reduce the amount that you're sending over the new facility, right? No. Well, not really, Your Honor, for a couple of reasons. First of all, again, some of these facilities have flow and sometimes the predominant flow is positive and sometimes it's negative. So saying that because a zone has flow in both directions doesn't mean that it doesn't, in fact, go in both directions. On some days, it goes one way. On some days, it goes the other way. You can't fairly net that. Holy cow. It's complicated, Your Honor, but this court doesn't have to actually hit the merits of it because FERC has already recognized in the Neptune proceeding that it itself has doubts whether netting is just and reasonable. Oh, that's raised in the Neptune. I thought it was only the de minimis question. No. No, netting is well, Your Honor, and that's been raised in that proceeding. FERC has already held that it may be unjust and unreasonable and has ordered a hearing on that. At the very least, this court shouldn't permit FERC to come to contrary results in two proceedings that are still alive. Well, we're not allowed in administrative law to look at subsequent proceedings to an order of this court. Actually, Your Honor, in the Williston Basin case, this court did precisely that. I can give the court the site of it. Williston Basin is at 165 F3rd 54. I'm looking at pages 61 to 63. In that case, FERC came to a conclusion while one case was up here being reviewed. FERC came to a conclusion in a different case it was looking at that went precisely the other way. This court remanded so that FERC could treat like cases alike. It wasn't asked to remand by FERC. It was the court's decision to do so. In this case, FERC hasn't yet decided either the de minimis or the flow question or the netting question. No, and Your Honor, to be fair, our view is that the de minimis issue is clear-cut enough that this court should address it straight out. Not so much for netting, which you didn't start with. We'll acknowledge, Your Honor, that netting is a more technical issue, and it's appropriate for FERC to look at both cases in the first instance. Suppose we think on netting, suppose we think there are reasonable arguments on both sides. On the one hand, that cuts in favor of FERC. It's reasonable either way. Their decision is not not getting in front of Neptune. But, I mean, we don't usually hold one case just because it has an overlapping issue with a pending administrative proceeding. So what do we do in those cases? We're not asking, Your Honor, we're not asking that this case be stayed or held in abeyance. We've been held in abeyance for many years already. Our request would be as to netting, Your Honor, that when this court remands the case and vacates for other reasons, that it directs FERC to decide the netting issue the same way as to both proceedings, so as to not treat, again, like cases unlike. We do believe that this court should, as I said, flat out hold that the 1% de minimis exclusion is unjust and unreasonable. There is and has been no rationale put forward in either law or logic or fact for it. The only things that FERC has said are, number one, when it came up with this 1% de minimis, it said, well, we want to make sure that non-adjacent zones are not held responsible for remote and distant projects. Here, of course, they're not throwing that argument to this court because PSAG itself was excluded, and that's the zone in which the projects are being done and for whose customers' benefit they're being done. So FERC here has two arguments it's made. One is that the 1% de minimis is a non-discriminatory and efficient way to ensure that zones aren't tasked with costs for benefits that are small in relation to their overall use of the grid. We think that accurately describes what the 1% de minimis is. The 1% de minimis is in favor of larger zones efficiently as a problem, not a benefit to it. Secondly, FERC has suggested that, well, sometimes they redo the defects calculation every year, and so who gets benefited and who suffers the consequences of the 1% may differ over time. That's, again, not much of an excuse for it, Your Honor, if it's an irrational methodology that leads to unjust and reasonable cost calculations. The idea that, well, sometimes it might work to hurt other people or help other people, again, isn't a rational justification for it. Besides, here, we know that it operates systematically. It operates systematically to help larger zones because they're more likely to be exempted and to hurt smaller zones who are less likely to be exempted. That led here to really results. The empirical data that we presented at Fort Worth and we presented at FERC with directly came out of the 1%. When we learned that Hudson and Linden had only 10% of the flow-based method benefits and yet were forced to pay 86% ultimately of the cost of the corridor project, that's solely and entirely due to the application of the 1% de minimis convention. And so it has led here, and that's true of all of the statistics that we used, to the results we're faced with. Now, FERC, we gave those results. Mr. Rasmus, could you just explain to me why, as a practical matter, was it not apparent to Con Ed that this would be the result of the application of the tariff? Because all of these provisions were set out in the tariff. Why did it come? Was it a surprise that this was the outcome of the calculation? So we're talking just about de minimis right now, Your Honor? About the de minimis. Yeah. Your Honor, what de minimis was defended as when it first came out, again, was a method that was going to really just work to ensure that distant zones were not held responsible for costs to which they had only sort of very small connections. And I know the math is the math. I realize the math is the math, Your Honor, but in most projects, most of the flow-based projects that have been an issue at FERC, there's been 1,200 of them that are flow-based, and we haven't seen these kinds of results come out of them. These projects are different. They have produced different results, Your Honor, and it couldn't have been predicted earlier because the whole modeling technology that PGM uses is a proprietary technology. And so trying to predict at first, yeah, we could have seen that it was irrational, but trying to predict at first who it was going to hurt, and therefore who had standing to challenge it, wouldn't have been something that we could have done. There are a lot of things that are wrong in life, Your Honor, but we don't complain about them unless they're going to hurt us. So I have another question then about that. So is the relief that you suggest that the tariff itself is unjust and unreasonable because it applies to the petitioners here. So is the solution to that to say that the tariff is unjust and unreasonable or that FERC should have given the petitioners some type of exception here the way they did for artificial islands? And what difference does it make to the petitioners if we choose one remedy or another? Your Honor, petitioners don't care because in this circumstance, petitioners are no longer using the services within PGM that would allocate these costs to them going forward. So as long as FERC does its job and reforms the rates, petitioners are satisfied. And one of the difficulties we have- But the relief is going to be prospective from the filing of your complaint, right? Or from our protest, Your Honor. In other words, we wouldn't say that the tariff was unlawful as applied going back to day one. No, Your Honor, just from the date of our protest basically to these complaints and then our actual complaints under 206 ourselves. And Your Honor, just one last point, if I may, which is the third point that I was going to hit today is that FERC failed to take into account relevant considerations when it just completely ignored our undisputed and fearful evidence of the grossly disproportionate allocations here. Now, what FERC said is we don't have to look at what actually comes out of the methodology. We just have to look at whether the methodology itself is just and reasonable. The problem with that is the Federal Power Act says that rates must be just and reasonable. And when FERC is presented with rates that on their face are unjust and unreasonable, it can't shrug and say, yeah, well, the underlying methodology- The problem with that argument is you have no principled ground, principled line to draw at which the disproportion between benefit and cost is too far, too much, number one. And number two, you're challenging the ex-ante approach that FERC has developed. Now, it seems to me your argument is stronger on the de minimis. Now, let me go back to artificial island again. I had one hell of a time trying to understand FERC's technological explanation as to why artificial island was different from your case. Could you explain why you think the- I know you can make a general statement saying all non-flow interferences should be treated the same, but that's not what FERC said. Can you give your- I'll do my best, your honor. Yes. So, in other words, they made a distinction between stability and short circuit. So, the only distinction that they made, your honor, in the order here, which is all we can look at, the rehearing order where they addressed artificial island and its application to this case, is that they said the solution in this case is more like the solutions that you come up with in cases that involve flow constraints. In other words, thermal and voltage constraints. The problem with that argument is that the solution here was building new transmission lines. That was the same solution that was used in artificial island. In artificial island, that new transmission line created another pathway, an additional pathway from generators to the grid. In this case, the new transmission lines bypassed circuit breakers that were not up to the task. In either case, though, were those transmission lines created like they are in flow based projects in order to enable greater flow? And because of that, you can't measure benefits here by the flow that goes over those transmission lines any more than you could in artificial island. So, the only distinction they came up with really isn't a distinction at all, because it's the same in both cases. What Firk said, by the way, to be clear, is Firk addressed the fact that there was a new transmission line in artificial island, because as this court will recall, the transmission owners didn't like the results in artificial island. And they said, well, there's a new transmission line here. And what Firk said is, sure, there's a new transmission line. But because the old transmission facilities already carried the DeMarva Party's power just fine, the fact that their power is now going to ride on this new line doesn't give them any benefit. The same thing is true here, Your Honor. There was no constraint to flow that was going on. We were already using – I'm sorry, Your Honor. But it – I see your point. But on the other hand, in the stability situation, you can solve the problem by building any number of transmission lines going to anywhere, right? You can connect artificial island to Delaware. You can connect it to Philadelphia. You can connect it to Cape May, right? And so there's an element of capriciousness in figuring, you know, which of those non-flow necessary lines will be built and then who will get saddled with the cost if you just – let me state it and then tell me why this is wrong. But if the problem is that the circuit breakers going from A to B, right, Bergen to Linden or wherever, if the circuit breakers can't handle the flow or whatever else is associated with that line, 99 times out of 100 you fix the where you fix the breaker problem on the A to B line by upgrading A to B. You upgrade the transmission line, which is what the Bergen project was. And that seems like it's much more in the model of you're improving transmission from A to B where the line only needs to radiate out from the nuclear plant. So, your honor, I don't think that's a correct understanding. First of all, the short circuit problems and no one, not even FERC has said that the short circuit problems were just along sort of an A to B to the Bergen corridor. In fact, there were short circuit problems here in Newark and in Jersey City. The short circuit, let me just take a step back, is something that is a surging current that is caused by lightning strikes and the like, right, where current can suddenly go 40 times as high. And if you don't stop the short circuit currents, it can melt or even explode facets of the system. So, for example, if a short circuit current is not stopped, it could blow up a substation. And the problem that occurs there, and of course, what you're trying to solve when you're curing for a short circuit is, it means that the load that is served from that substation no longer can be served and the lights go out. That's a huge problem for PSA because the local load is the one that primarily suffers. Sure, everyone else's electricity gets rerouted in some way, but they still get their electricity. So, it's a local problem and that's why when you just get a new circuit breaker, the tariff provides at page 1975 that the local utility pays 100% of the cost. Here, instead of fixing it that way, they didn't improve the network to fix it or improve the lines to fix it. They literally bypassed. They created transmission lines that just bypassed what they call over-duty circuits. In other words, circuit breakers, circuit breakers that weren't up to the task. So, they created a loop around them, that sort of thing, to bypass them. But that doesn't provide us a benefit just because our but I mean one of the shorthand descriptions for the Bergen project, I'm sure this is oversimplified, but just on the A to B point, is that they upgraded that particular line from 138 kilovolts to 345 kilovolts on that line. And I'm sure a little bit of knowledge is a Your Honor, there's no doubt that along the way they gold-plated what they were doing. In other words, they did more things than just cure the basic short circuit problem. But the purpose, of course, of the project, and you can look at JA378 or JA176, unquestionably was to address the short circuit problems. It was the primary benefit of the project was to solve those problems. And to be clear, FERC didn't defend the results here otherwise. It didn't say, we're treating this case differently from how we treated artificial island because there are substantial other benefits that are created and the flow-based method is the way to measure them. They've never advanced that as the rationale, Your Honor. They're free, of course, to try to do that on remand. But given that the only thing they've done is a one-sentence comment that the solution here looks a lot more like the solution that you use. I would say intolerably. Unless you go back and dig into Mr. Hurling's testimony, which I actually did. Of course, Your Honor, if you look at Mr. Hurling's testimony, he treats short circuit problems and stability problems the same way. And so did PJM generally, and so did PJM's president and FERC relied on all of this PJM input to decide the artificial island case. So I fully would embrace Steve Hurling's testimony here, Your Honor, and just say that what he said and what PJM said didn't draw any lines between the two. I'm sure I've gone way over my time for my affirmative presentation. Judge Rao, anything else? Judge Silberman? No. Okay. Thank you, Mr. Bresch. Mr. Eilander, you're up. Good morning. May it please the court, Elizabeth Eilander for the commission. I'd like to go to the essential point of this case, which all three of your honors asked questions about. And that is why this case is not the same as artificial island. And the commission... Can I just start where Mr. Bresch left off? Because this was on my list of questions for you, which is, if you look at Hurling's testimony, he does not distinguish stability issues from short circuit issues. The commission dug into that, Your Honor, in the technical conference, where it took an entire day with experts from... You may have looked into it in a technical conference, but I'll be damned if I can understand your explanation. It's your burden, is it not? Under APA, the party that wishes to and neither in your brief nor in the clerk's opinion, could I understand the logic. And if we can't understand the logic, aren't we obliged to remand? Yes, Your Honor. But if you could please clarify which logic... The logic that distinguishes artificial island from the present case. What did you say in the brief? You were pretty terse in the brief. You certainly didn't give enough to explain it. So then I looked back at the order and I couldn't figure that out either. Okay. I hope this will also address Judge Katz's question at the same time. It is the same. Okay. The reason this case is different from artificial islands is that when you're resolving a stability constraint, which in that case was around a nuclear power plant in southern New Jersey, it's important to carry electrical flow away from the source of the problem. And the strength of the grid in that area was not sufficient to carry enough power away. So as Judge Katz said earlier... What was the stability problem? The stability problem refers to the operation of the plant itself. If not enough power is being carried away, it can cause problems with the rotation of the electrical equipment generating power within the facility. So you don't... Is an exterior issue other than flow? Exterior in that it's part of the grid. The grid has to carry... Analytically exterior. Yes. So in order to solve a stability problem, you carry power away from the problem. And in order to solve a flow-based problem, you carry power to the problem, i.e. there's not enough generation to serve load. And that is what was happening here is the short circuit problems and impending thermal problems on this North Jersey project were making it more difficult or would soon make it more difficult for PJM to carry load, to carry power to the places it was going in North Jersey and New York. I'm not sure that's right. If you look at the technical conference again, the way they seem to be conceiving of short circuit problems is that the breakers are as strong as the breakers are. And as the flow increases over that line and the breakers stay the same, at some point, the breakers become not strong enough to support whatever flow is going over that line. Is that not right? No, that is right. But the solution is that similar to solving a thermal problem, you need to build additional transmission capacity or install additional equipment to carry more power. The essential point, as your honors brought up earlier, is that FERC did not make this method according just to whether the violation in question was non-flow based. It's an artificial island. It's subdivided that category and found the exemption was only for stability related issues. In this case, FERC drew the same technical distinction that we discussed earlier and determined that the nature of the upgrades were such that the flow-based method did appropriately allocate costs and could be reasonably applied to this case. As Judge Rao asked earlier regarding what ConEd could and couldn't foresee, all of the rules are set out in the tariff. And this flow-based method has been uneventfully allocating costs for nine years to a total of over 1,200 projects. That's not a dispute in this case. Correct. It is not a dispute. So, I don't know what that has to do with the price of tea. What it means, your honor, is that in a case like this one where the rate works the vast majority of the time, the commission has held that there's a very high chance it's just unreasonable. And what the petitioners say that they want here is just an exception. They say they don't care what the court decides in terms of whether the rate is or is not just unreasonable. They just don't want to pay the cost that they're owed. May I ask a question about the de minimis rule? Yes, your honor. How, in Lord's name, can you defend the logic of that rule? The de minimis rule... I'm a real big guy. I can avoid any cost responsibility, even though I use a massive amount of electricity from a particular source, as long as it's a small percentage of my total load. What's the logic of that? Yes, your honor. The de minimis rule is set in terms of percentage as opposed to a number of megawatts or some other measure. In order to measure the total impact of a zone... I'm sorry. I'm looking at the wrong place in my notes. The intent is to prohibit the assignment of costs to far-distance zones. For example, as the Seventh Circuit noted in Illinois Commerce Commission, to prevent the assignment of costs to Illinois for these upgrades being built in New Jersey. The reason it's set as a percentage is that everybody has a percentage. So the New Jersey utility, which is PG something or other, is a far-distance operation? Far-distance from where? No, certainly it's not a far-distance utility, your honor. So what is this relevant to? What we know we can't do is assign costs far out of the zone. And what there seems no principled way to do is to choose a number of megawatts that should be exempt. So the commission has opted for percentages. And as noted at the very beginning of this argument, that's... It's a percentage, but a percentage of the wrong denominator. Yes. The point of this method is to measure what, for any given facility, what's the percentage use by any particular utility? And instead of using that percentage to cut off de minimis users, your denominator is not total use of the facility. It's total use by the utility, which is going to be wildly arbitrary when you have situations like this one, where one of the utilities at issue is 30 times bigger than other ones. Again, your honor, the commission in applying what has been baked into the tariff since beginning said that that's not the case and that it is a non-discriminatory way... That's not the case, that my description of the percentages is wrong? What the commission said is that it's a non-discriminatory way of ensuring the costs are allocated only to the zones that benefit. I said, I do understand your honor's point that public service electric and gas is a very large zone. Brian, even if the tariff itself is just and reasonable, it's an application here to PSD and G, and to the petitioners here. I mean, isn't that allocation itself unjust and unreasonable because of the application of the tariff in these circumstances? A circumstance you acknowledged wasn't the one that the de minimis rationale was implemented for? Judge Rall, I'm sorry. I missed the beginning of your question. Could you ask it again? Yeah. So my question is, I mean, this de minimis convention is a different type of circumstance, right? Where a utility is far away from a particular facility. And here, even if maybe the tariff in general is just and reasonable for most applications, its application in this case seems to be wildly disproportionate. I mean, isn't FERC required to ensure that the allocation is itself just and reasonable? Certainly it is, your honor. And the commission and PJM have spent many years developing first, in FERC's case, a rule to ensure appropriate allocation of costs. In PJM's case, a rate that accurately makes that allocation. What happens when you start to look at every single cost allocation after the fact is that the ex ante principle of the rate is undermined. The idea is that everybody understands ahead of time by reading the tariff how cost allocation works, what they can reasonably expect, and how the allocation process will play out. Here, the rate identifies beneficiaries over years as the grid shifts and changes. And PJM found that both parties both in New York and New Jersey benefit. There will certainly be instances, and the petitioner's brief does refer to individual sub-projects, not to the project as an entirety, where it looks as though the netting and de minimis made larger exemptions than they felt were warranted. But they talk only about individual pieces of these projects. They don't talk about the projects as a whole, particularly the Bergen-Linden project. So, what I'm saying is that I think when you started off in your discussion with petitioners is that it's very important that there be settled expectations in terms of how PJM will analyze beneficiaries, how the cost of those beneficiaries will be allocated,  and how they're going to be used. Right. But Miss Freilander, I absolutely take your point about the importance of setting ex ante rules for allocation. But old dominion suggests that FERC cannot simply rely on the fact that it has an ex ante rule, right? It also has to examine whether the particular allocation is just and unreasonable if that's raised before it. And to balance those two things, I mean, I think that is the real question I have. I mean, in a situation where, say, maybe the tariff is just and reasonable, what is FERC's obligation to evaluate whether a particular allocation is just and unreasonable? It can't simply say, well, apply the tariff properly. So, what does it have to do in the particular application of the tariff? So, this case involves both filings under Federal Power Act 205 and under Federal Power Act 206. And as I was explaining earlier, FERC expects that because the formula here is sound, it will produce good results. And in those Federal Power Act 205 cases, it ensured that the tariff was followed and that the results were as expected. That's the corridor order, the subprojects order, and so forth. But FERC has always allowed, and in this case, entertained on three separate occasions, Federal Power Act 206 challenges to the rate itself. I can't remember exactly what this procedural setup was in Old Dominion, but that is – but in the same – but regardless, FERC has provided the same opportunity to us here to challenge the way – to challenge the way the costs were allocated. Old Dominion – Old Dominion was you approved an amendment for a certain category of projects that we thought didn't work. And we were sensitive to this concern that rules are rules and you don't have to go around creating an exception every time you think the rules might not work. But we also were careful or we tried to be careful to say that the distinction that we thought you were missing in that case was between high voltage and low voltage lines and that was one that the commission itself had told us was important. Yeah, and certainly you're right. I'm quite familiar with the case. I just couldn't remember Federal Power Act 205 versus 206. And in Old Dominion what we had approved as you said was an amendment to this very cost allocation that's at issue here to limit the application of – to limit the allocation of the cost allocation for high voltage lines. We've not done anything like that here. This is the cost allocation that has been again approved uneventfully allocating costs in more than 1,000 projects for some years. So on that rules are rules point, one conclusion that you might draw out of that is that this is a collateral attack on the tariff but FERC does – the intervenors make that argument but FERC does not. So do you have a position on that question? We did not raise that argument because again FERC has allowed parties to raise challenges to individual findings as an artificial island. But here as there there's no issue of an exception or a change to the rate. So I would say broadly no. I don't think this is a collateral attack but an as applied challenge in which the petitioners are requesting an exemption from the rates. It's a tough – it's tough sledding for them if you posit that the general rule is fine qua rule and they're saying well but it doesn't work well in this case. And assume for purposes of argument I think if you think of this as did FERC explain why one might reasonably think of a circuit breaker case as being akin to a flow case maybe I agree with you on that. But we're still left with artificial island and you did what you did there and it seems like you would – you need to give us some reason why to justify treating circuit breakers different from stability. And I think that's the tough part of the case for you. Stability again your honor is electrically and analytically a strange situation in which as your honor pointed out as discussed in the tech conference you can build a transmission line going anywhere and it will help the situation. And then at that point the designation benefits becomes very arbitrary. It could be Philadelphia. It could be Allentown. Could be as in this case Delmarva which did not need the power. So they are – Excuse me. Your colleague, your counsel on the other side said in the case before us there was the same transmission lines built to avoid the circuit breaker. Is that correct? I'm sorry I'm not – I'm not sure I understand your question your honor. I'm not sure I understand it either. But he did say that in both cases transmission lines were built to get around the problem. Get around the problem. Yes. There were in both cases transmission lines were built. But the distinction here – To get around the problem, right? To carry power away from the problem in artificial islands and yes. Sorry if I'm being imprecise when I said get around the problem. But of course I'm referring to power. Okay. I wasn't referring to pencils. Okay. The critical difference legally between this case and artificial island is that in artificial islands the flow-based method did not accurately identify the beneficiaries because of the arbitrariness of where that new line goes. And in this case where the facilities were built and the commission said at least twice in the orders these facilities – this project is an upgrade to facilities used to carry power to New York. And the benefits do follow the flow of power. And you can tell who is – you can tell who is benefiting by doing the flow-based analysis and seeing where the power goes. Con Ed has – Con Ed's contract requires – allows it to take 1,000 megawatts from PJM. The merchants take another 600 and some megawatts. It's a significant amount of power that's going to New York and that these facilities are supporting. In artificial island what FERC eventually came up with is something called a disruption analysis. In other words you would allocate flows. You would figure out what happened. Who would be harmed if a stability problem came to fruition and you would allocate flows? The benefit being measured is avoiding that harm and you would allocate flows accordingly. Why wouldn't that same logic apply here? Which is you're not building or upgrading the line to enhance flow. You're building the line to prevent a separate problem which is the circuit breakers fail which could cause all these explosions and such. So why couldn't you just figure out what would happen if that – who would be harmed if that very bad contingency came to pass and then allocate benefits in terms of avoiding that harm? Seems like that's pretty analogous. The replacement rate that was developed in artificial island was not an issue in the appeal. No one ever challenged it. It goes to the underlying question of whether circuit breaker problems are more like artificial island or more like run-of-the-mill upgrading the line projects. It sounds as though if you're looking at who would be harmed, that sounds more like a violation-based analysis to me. And the commission has some time ago – I'm sorry? Who would get the benefit of not having explosions when the breakers fail? Who would get the benefit of not being harmed? Fair enough, but that's a little bit different from the violation question which would ask who caused the situation – who caused the circuit breakers to no longer be good enough. It's not that question. And I suppose the commission or AJM could look at the problem that way, but it hasn't and doesn't. It looks at benefits from the flow of power, which this court said only the week before last was a reasonable way to identify beneficiaries under the flow-based analysis in the Long Island case. There's certain – I would bring that back to the essential question of this case, which is not whether some other rate might be just and reasonable, but whether this rate is just and reasonable. The commission certainly could have resolved this case some other way. It certainly could have weighed the evidence. It could have come to some different conclusion. But what the court is – the court's task here is to decide whether the conclusion the commission did reach is a just and reasonable one. And I would say again – Counselor, our problem first is to fully understand the FERC's rationale. And if it has not been articulated either in the order or in the brief adequately, then what is our appropriate response as a judge? Your Honor, is there – you've asked several specific questions about how to distinguish this case from Artificial Island. It sounds as though – it sounds as though, Your Honor, it's not yet reached – Your Honor may have further questions. No, my problem – my problem – I don't know about my colleagues – is I don't find the explanation that FERC gave distinguishing the two situations adequate. That's my concern. I would say that the commission is not required to carve out exemptions for arguably different subcategories of projects. The commission went to an extraordinary amount of effort to analyze this case, including issuing 17 or so orders, holding a technical conference, setting it for settlement on two separate occasions, and in the end concluded that this case was different enough from Artificial Island that the approved cost allocation that everybody expected should apply. I am happy to try to – I'm happy to continue trying to help understand where the distinction comes from. Judge Silberman, anything further on that? No. I guess just one more for me, I guess, which is to what extent does the commission have concerns – put aside what should happen in this case, but to what extent do you have as reflected in the Neptune proceedings? The Neptune – the order of the complaint proceeding in Neptune stated only that the commission was interested in gathering more information. Briefs and responses have been submitted, and the commission is considering the matter. There's no ruling yet. And if you were to – if you were to afford relief in Neptune, would that just – if you were to agree with the concern, would that just change the tariff provisions going forward, and then Mr. Bress's – all of the clients involved in this case would effectively get relief going forward? I don't want to speculate on exactly what the commission might or might not do. I can say that the refund effective date in that complaint proceeding was set, I believe, December 31st, 2020. And there were questions asked about what would occur if the commission ruled a certain way, and the best thing I can say is that we will address that at the appropriate time. But the matter remains pending before the commission. Okay. Do my colleagues have anything else? No. Okay. Thank you, Ms. Rhinelander. We'll hear from Mr. Gossett for the interveners. Mr. Gossett, I think you're muted. Mr. Gossett, you're muted. I can't hear you. Sorry. Sorry to interrupt. Yes, I had turned off the Zoom mute and not the mute on my microphone. I'm very sorry about that. Go ahead. Several technical problems this morning. Good morning, Your Honors. In my limited time, I want to touch briefly on five points, all very, very quickly. And the first – and I think it's important to return to that because all the judges – all three judges have flagged it, but I think we need to remember its importance, which is that FERC in this system designed this process to be an ex-ante process where these costs are allocated in advance and that we don't necessarily go through exactly the endeavor we're involved with here. Judge Rao pointed to the old Dominion case where – and for the proposition that FERC has to examine whether that system led to a clearly flawed allocation of costs, but they did that here. That's part of the technical conference, and frankly, that, to my mind, is the real lesson from Artificial Island. The technical conference addressed both Artificial Island and the Northern New Jersey project, and FERC determined that one situation was sufficiently extreme to an exemption from the ex-ante system, and the other was not. So, the – And where is the substantial evidence within the technical conference to support Burke's assertion that the Bergen-Linden circuit breaker problem is more like a routine upgrade than like Artificial Island? I'm pulling up my copy. I believe I wrote that down as being page 1166. Yes, where it says, circuit breakers are components that are part of facilities that carry flows. In the end, it's a component of the interconnected grid whose purpose is to carry flows. So, you can measure against those flows to see who's using those facilities. That's in the technical conference. And where I was actually going to point the court in response to Judge Silverman's questions about whether FERC had said this in its order, in its orders, were in two separate places. First, on page 362 of the –  Sure. that Artificial Island and Bergen are different. That's really an argument that making an exception for either would be moving too much back to a violation-based method. At page – well, I didn't interpret it that way. I believe it was – I mean, because it specifically differentiates the two. Because it's about circuit breakers being a component that carries existing flow. And I think that's the critical point here, is my friend Mr. Brest wants to claim that the distinction is whether a problem is flow-based. But I think the real issue is whether the solution is on a – it can be appropriately determined based on flows. And so, again, in the technical conference, and I believe this was at page 1140, is that's where, in the technical conference, there was further discussion of the proposition that Judge Katsas, you, and I believe also Judge Rao made about how, with respect to Artificial Island, it was almost random on whom these costs would be allocated because it just depended on where Artificial Island was connected to the net. It could have been 90 percent in Delmarva, it could have been 90 percent in Pennsylvania. Based on that connection. But here, and this is true of a thermal load problem or a circuit breaker problem, there is an existing facility. That facility has a problem that needs to be fixed. And in fixing that problem, you see who benefits from that facility. That – so – When you say – and just to be clear, when you say facility, we're talking about the transmission line from Bergen to Linden. From A to B, right? As well as the Seawarren facility as well. But yeah. Just simplifying. Yes. Bergen versus Artificial Island. Bergen is an A to B problem. Artificial Island is an A to anywhere problem. Correct. And at page 362 of the Joint Appendix, which is in one of the Commission's orders, they specifically make this point. And they say, in contrast to stability-related reliability issues for the Bergen-Linden Corridor Project, PJM must upgrade or reconfigure the transmission system specifically to reduce short-circuit current on the overdue element in a manner similar to the planning process for resolving thermal overloads. That's the Commission's own words saying the distinction between thermal and short-circuit is wrong. The distinction is between stability, like Artificial Island, and projects like Bergen-Linden or a traditional thermal problem. I see it. But you do have to squint a little bit. You do. But, Your Honor, that's where it's important also, of course, to remember that FERC is the expert here. I mean, I am hard-pressed to come up with a case that is more technical and deeply involved with FERC's expertise than this one. They looked so carefully at this over the course of an eight-year period to make these nuanced distinctions between the two projects. Mr. Gossett, why, I mean, why when, you know, if the Bergen project is a kind of A to B project, why, I mean, I guess maybe you can explain why that isn't about stability from A to B. I mean, why is that more about flow? Because in part, the Artificial Island is about stability in a particular place, in a particular facility, and this maybe, you know, one could say is about stability on a particular line. It's not about increasing the flow. It's just making sure that the flow in this one corridor is done without any short circuits. Your Honor, stability is, as I understand it, a technical term of art, and the real issue on, with respect to Artificial Island, is that it's power generation, and it's a stability problem with respect to the generation of power at these three nuclear plants on Artificial Island. Stability is not a question of is the line stable. I mean, if the Bergen-Linden line had a short circuit and a fire and blew out, then power would not flow to New York in the way that they have a contractual right for it to work, to get. And therefore, they are directly affected by a stability problem on this line, just as they'd be directly affected if there was a flow problem because too many people are trying to get energy over this line, and we can't get enough energy to the people that have a demand on it. Both are about this line, and let's just call it the A to B line, as Judge Katz has said, and there's a problem with the ability of energy to flow across this line to its recipients, and the New York entities were major recipients of this. I mean, the 1600 megawatts of power that we're talking about here is the equivalent of two nuclear plants' worth of energy. This is not a small amount of energy we're talking about that flowed to New York City through these projects. I'm mindful that I'm sort of over my time, but if I may, I would like to briefly touch on the de minimis point, which does work here. It's designed to eliminate small diffuse benefits, so that's why it was designed. It doesn't do that. It would be a perfectly sensible rule if the cutoff were percentage use by the individual utility relative to total use of the facility, but that's not how this cutoff works. But it's designed to see how much the utility cares about it, which- I have to say, counsel, I thought that was an ingenious effort to provide an explanation for FERC, but I don't think it quite works. First of all, FERC didn't use it, but secondly, I don't think it quite works. Well, it's- I give you a lot of credit for imagination. Thank you, Your Honor. I do think it was what the parties intended, and I also think it's what the tariff says. I also think it's important to look at some of the numbers here, because the petitioners talk about the de minimis problem as if it's about exempting PSEG from paying for this project. If you actually look at the numbers, at JA135, you see that the effects on PSEG are actually quite small. For Bergen Linden, it reduces their allocation of costs from 17% to 7%, and for Seawarren, it's from 4.8% to 0%. So it's not like most of this cost would otherwise have been on them. JA551 is a chart- in fact, 52 is even better- is a chart that shows that the vast majority of the effect of the de minimis rule is exactly what it's supposed to be, which is- exactly what- Justice Katsas says it's supposed to be, which is about exempting all of the 22 zones in PJM that are far away in Illinois or Ohio from this, because their effects are small. But really, the- I mean, a de minimis rule is a decision by the members of PJM on how to allocate the costs of a project. It doesn't allocate costs to someone who doesn't bear a large burden. It exempts certain ones of them, and that's reasonable. The rule that Justice Katsas seems to be advocating for, that it should be based on 1% of use rather than 1% of that entity's use, is certainly a reasonable rule, but that doesn't mean it's a rule to do what not. It's not just some reasonable rule plucked out of the air. It is what solution-based defects is measuring. Solution-based defects is measuring to whom the power goes, but then the question of how to allocate that cost is one that is not just a question of applying a formula. It involves some choices made by the PJM members about how to divide up those costs, and the choice that they made was to include a de minimis rule of this form. They can change it, and indeed, of course- The conceptual point, tell me if I'm wrong, but the conceptual point of solution-based defects is if PSE&G uses, and I may say this imprecisely, I'm sorry, but you have some new facility, the PSE&G uses 10% of it, they should bear 10% of the cost, right? No, Your Honor, that's not it. Well, because, of course, solution-based defects, and this was a point of Judge Rouse earlier, is a system that includes a vast number of specific formulas and conventions about how you determine the allocation, and the de minimis rule is one of the very bases of the system. It's not an exemption. It's part of the formula for deciding where to allocate the costs, and the decision made by the PJM members was that what they cared about in allocating the cost was who actually depends on how important it is to them, and a project that only is relevant to 0.8% of a utility's energy flows isn't very important to them, whereas a project that affects 20% of an entity's flows is very important to them, and that's true irrespective of the absolute number of how much energy flows over them. It's about relative importance, not about relative use. I think we understand your position on that. Judge Rouse, anything else? Judge Silberman? No. Okay. Thank you, Mr. Gossett. Thank you, Your Honor. Mr. Bress, rebuttal. Sorry, Judge Cass, if you may, please, the court. On one preliminary note, we agree, by the way, that just shifting costs to PSAG wouldn't cure the whole problem, but that's not actually a saving grace of the 1% de minimis. It actually dams it. If this court were to look at, for example, JA576, it shows, with regard to the Bergen or Corridor project, who has what percentage of use with and without the de minimis, and what it shows is that there are certainly other entities, not just PSAG, who had greater use, for example, than Linden or HTTP, and that were exempted. The problem is, you can say they're more distant, which is one of the things FERC said, is we don't want to attribute costs to more distant zones. They're really misusing the seven circuits holding there. The seventh circuit was saying, well, more distant zones that are using these new facilities less shouldn't have to pay most of the costs. Here, solution-based defects is purporting to tell us how much they actually use it, and we're just saying let's charge them for how much they use it rather than give them an artificial exemption. Number two, I'd like to correct one factual issue, if I may, that has, I think, crept into the discussions here. The court has been addressing whether the short circuit issue is something that is caused by flows, and it is not something that's caused by flows. It's caused by short circuit currents rather than by flows. This is at 537 of the JA. If the court would look at that, there is a description of how this works. What it says is that to determine the beneficiaries of a project designed to address short circuit violations, it's not reasonable from an engineering perspective to use the flow-based method because instantaneous fault currents, rather than steady-state energy flow, are key components of the problem. Energy flow is not a contributing factor to short circuit violations. Now, there's no evidence in this record to the contrary, because that's actually how it works. Short circuit currents are just caused by instantaneous surges, caused by lightning or such. It can be caused by how much generation is on the line, but they're not by generators that are near the line, but it's not proportionate to flow. So, the idea that it is is incorrect. Sorry, help me out with that, because I could not look at 537, 538. Yes. Was working off of Hurling's testimony, and he seemed to describe the short circuit problem as one that would become incrementally more acute as projects are built and flow expands. Is that not right? It's not quite right, Your Honor. It's basically, as you get more generation on the line, it's actually, and again, we're getting pretty technical for me, but it's actually caused by the amount of inertia that's in the generators that are feeding into the line. Not by the amount of flow that the line happens to be carrying. In any event, if I may, I'd like to address the ex-ante issue. This court addressed it already in Artificial Island. In Artificial Island case, the transmission owners, as they do today, came in and said, well, the whole point here is to have an ex-ante system, and you can't change it just because you don't like the results as to a particular project. This court rejected the transmission owner's argument directly, and it pointed to three things. Number one, it said, or actually two are relevant here. Number one, it said that Order 1000 itself requires as its first in principle rule, the cost causation principle. That is its very first principle that costs must be allocated in a way that are roughly commensurate with benefits. Number two, the court pointed out, so in other words, there's no inconsistency with ex-ante. The cost causation rule trumps ex-ante. Number two, the court pointed out that certainly whatever Order 1000 says, Section 206 of the Federal Power Act trumps it. The next point is that the tech conference did not look at the results. There was an argument that was made here that the tech conference looked at the results. You can look in vain through the tech conference, and nobody adverted in that conference to the cost misallocations that are at issue in this case. The tech conference had nothing to do with that. Next, there's an argument that there's no need to make the same— Suppose, counsel, we were to conclude that the FERC's rationale in distinguishing the two was perfectly logical. By that, I mean artificial island in the present case. Would the disparity in cost any longer be relevant? Well, the disparity would be exactly what it is, Your Honor. It would be relevant because the disparities that we've pointed to are entirely caused by the 1% de minimis convention. Oh, yeah. Put aside the 1%, I guess. Well, that's what's causing the disparities. You make a powerful point. Put aside the 1%. You understand my question. If we thought it was a logical distinction between artificial island and this case, then the misallocation of cost, in your view, would be irrelevant, wouldn't it? Yes, Your Honor, only because if we're putting artificial island to the side, all of the numbers that we've presented the court as to the misallocation have to be put to the side, too, because those are all just the results of the 1% rule. So, in other words, if you take that rule out, we don't have— In other words, even if you— Well, then the artificial island is irrelevant. No, Your Honor, it's not. What our proofs are, are that even if you accepted Flaubert's method as a correct method— I want to make sure I understand. If we agreed with you on the 1%, then what I've just heard you say, the misallocation of costs and benefits would be solved without ever discussing artificial island. No, Your Honor, and let me try to be more precise in my answer for you. The numbers that we've presented, such as Bergen and Linden— I mean, sorry, Linden and Hudson having 10% of the allocated benefits and 86% of the allocated costs, those numbers are purely results of the 1% rule. However, putting aside the 1% rule, we have the same issue here that Delmarva had in artificial island, which is there's also a basic non-quantitative problem here. That leads to misallocation, which is they're measuring the wrong thing. By measuring— Wait a minute, stop. So you made clear at the beginning that without the cost problems, you wouldn't have an injury. So are you now telling me that if you prevailed on the 1%, you no longer have an injury? No, no, Your Honor. What I'm saying is— What is your injury if you prevail on the 1%? Even if we prevail on the 1%, the methodology for determining our benefits— we'll agree at that point that if you buy into the methodology for determining our benefits, at that point, costs and benefits will be allocated correctly. The problem is that the methodology for determining the benefits to begin with is flawed. It is— No, but counsel, you're not really responding to my question. If we agreed with you on the 1%, is it correct to say that the misallocation of costs and benefits would disappear? And therefore, why is there any relevance to you? Because you made very clear in the beginning that if there wasn't a misallocation of cost, you wouldn't have an injury. Why is there any— Your Honor. Your Honor, the answer is the cost and misallocation doesn't disappear. One component of it does. In other words, the numbers we presented the court with are assuming, for purposes of argument, that the flow-based method correctly identifies our benefits. We are still being charged far more cost than that because of the 1% issue. But now we can say that we also don't think that the flow-based method is correctly determining our benefits. It is overestimating our benefits to begin with. So, in other words, the real cost misallocations are larger than the numbers we presented. It sounds like you're saying these two issues are belt and suspenders for you. Are you saying that? No, I'm not, Your Honor. Your Honor, I can try one more time on this. The numbers we presented that show the gross misallocations are based on the assumption, for purposes of argument, that the flow-based method, for example, correctly says that Linden gets 28% of the benefits of the Seward Project. And our argument about the 1% issue is, gosh, because you apply that, you're not charging us 28%, you're charging us 100%. So that's the effect of the 1% issue. And that would cure that problem. But we're also arguing that the idea that we get 28% of the benefit to begin with is also wrong, because the flow-based method is an incorrect and unreasonable method to determine our benefits to begin with. We believe our benefits are actually far less than 28%. So, yes, the 1% gives us a lot. Does it matter in terms of the cost to you? Yes, absolutely, Your Honor. So, we have paid $150 million, Your Honor. If you strike the 1%, that will give us about half of what we've paid back. We still think that the 75 we're left with is an overcharge because the flow-based method isn't an adequate method to demonstrate the benefits that we get from curing these short circuits or from storm-hardening Seward. Is your position, then, that the petitioners owe nothing for these upgrades? Absolutely not, Your Honor. A couple of answers. First of all, happy to pay our fair share. Secondly, for the high-voltage parts of projects or sub-projects within these, as this Court recognized in Old Dominion and has recognized before, there's a 50-50 methodology. So, in other words, some of the costs are already being paid for those sub-projects on a postage stamp basis for 50% of it and by solution-based defects for the other 50%. So, we're already paying on a postage stamp basis our fair share for the high-voltage projects. Our complaint on those projects is we're being overcharged for the other 50%. For the low-voltage projects, we're not claiming that we should owe nothing. We're saying, as Judge Cassis has indicated before, and I'm not ascribing a conclusion to you, Judge Cassis, we're just asking the Commission to do the same thing it did in Artificial Island, which is to tell PJM to go back and say, look, who benefited from fixing this problem? There was who benefited from fixing the stability problem. Here are two benefits from fixing the short circuit problem. We're happy to pay our fair share of those benefits. Okay. Judge Silverman, anything else? No. Judge Raff? Okay. Thank you, Mr. Bress. Thank you so much for your time. Case is submitted.
judges: Katsas, Rao, Silberman